FILED

2008 Sep-30  PM 04:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | |
|---|---|
| **DONALD E. MANDY and**<br>**KATHY Y. MANDY**, | ]<br>]<br>] |
| **Plaintiffs,** | ]<br>] |
| **v.** | ]          **CV-06-BE-1854-S** |
| | ] |
| **SELECT PORTFOLIO SERVICING,**<br>**INC. and HOME EQUITY SERVICES**<br>**CORPORATION,** | ]<br>]<br>]<br>] |
| **Defendants.** | ] |

## MEMORANDUM OPINION

This matter is before the court on "Defendant Select Portfolio Servicing, Inc.'s Motion for Summary Judgment" (doc. 68); "Motion for Summary Judgment" filed by NationsCredit Financial Services Corporation (doc. 71); "Motion for Order That Certain Facts be Taken as Established" (doc. 108) filed by SPS; and "NationsCredit's Motion for Order That Certain Facts Be Taken as Established" (doc. 110).  These motions have been fully briefed.  For the reasons stated in this memorandum opinion, the court will GRANT the motions that certain facts be taken as established.  Further, the court will GRANT both Defendants' motions for summary judgment based on the doctrine of *in pari delicto* and will DISMISS Plaintiffs' entire case.

## I.  STANDARD OF REVIEW

Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying [the evidence that demonstrates] the absence of a genuine issue of material fact. *Id.* at 323.  After the moving party demonstrates an absence of evidence to support the nonmoving party's case, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.  A dispute of material fact is genuine if a reasonable jury, applying the relevant law to the evidence presented, could return a verdict for the nonmoving party.  *See Barfield v. Brierton*, 883 F.2d 928, 933 (11th Cir. 1989).

When considering a motion for summary judgment, a court must view the facts "in the light most favorable to the non-moving party . . . . ." *Harris*, 127 S. Ct. at 1776.  The court does not "weigh the evidence and determine the truth of the matter" but rather, simply focuses on whether a genuine issue of material fact exists.  *Anderson,* 477 U.S. at 249.   Where a reasonable fact finder may "draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007).  "[T]he plain language of Rule 56( c) mandates the entry of summary judgment, after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which the party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23.

## II. <u>FACTS</u>

### A.  The *Curry* Settlement

The Plaintiffs, Donald E. and Kathy Y. Mandy, were members of a class in a previous lawsuit against Fairbanks Capital Corporation, *Curry et. al. v. Fairbanks Capital Corp.,* No. 03-10895-DFW (D. Mass.) ("*Curry*").  Fairbanks Capital Corporation changed its corporate name to Select Portfolio Servicing, Inc. ("SPS*")* in or around July 2004; accordingly, the court will refer to both Fairbanks Capital Corporation and SPS as "SPS."  The *Curry* Complaint alleged improper conduct on the part of Defendant SPS in a wide variety of loan servicing areas, including untimely posting of customer payments; collection of improper fees, costs, and charges; force-placing hazard insurance when such insurance was not needed; conducting wrongful foreclosures; and engaging in unlawful collection practices.  The class and SPS entered into a nationwide global settlement of the *Curry* action that Judge Woodlock of the United States District Court for the District of Massachusetts approved by a final judgment entered on May 19, 2004.  Plaintiffs did not request exclusion from the class.  The final judgment found that members of the class were "bound by the Settlement Agreement, including the Releases (with applicable exceptions), disclaimers of liability, covenants not to sue, and injunction against further litigation contained in the Settlement Agreement."  (doc. 15-4, Exhibit D, ¶ 10). The *Curry* settlement released all claims within the class period against SPS related to (1) the alleged

3

conduct challenged in the *Curry* Consolidated Class Action Complaint; (2) SPS's servicing of loans in, or considered in, default; and (3) the charging, assessment or collection of prepayment penalties in Massachusetts, West Virginia or Alabama, or that were otherwise charged, assessed or collected in violation of law or contract. The class period designated in the settlement was January 1, 1999 through December 10, 2003. The Mandys acknowledge that they had released SPS from liability for any misconduct that occurred prior to the end of the class date, December 10, 2003. They assert that instant suit relates to SPS's wrongful conduct in 2004. Although Plaintiffs do not assert – and cannot assert – any claims against SPS for conduct prior to the end of the class date, a full history of the relationship among the parties is necessary to understand the issues and because of the claims against NationsCredit.

B.  The Mandy Mortgage Loan and Foreclosure

On February 8, 1999, Plaintiffs, Donald E. and Kathy Y. Mandy applied for a residential mortgage through a Uniform Residential Loan Application, stating their monthly income as $4000 and certifying that the information provided was true and correct. Donald E. Mandy was listed as the borrower, and he signed the application and initialed each page, including the page listing the family monthly income as $4,000. The application included a provision in which the applicants agreed that the ownership of the loan might be transferred without notice to them.

The Mandys obtained a mortgage loan with First Franklin Financial Corporation, as lender, for the purpose of purchasing residential property. This mortgage included a clause giving the lender the right to sell or assign its servicing rights and obligations to a third party. Mr. Mandy executed a note, secured by the mortgage, in favor of First Franklin in an original principal amount of $106,500.00. The mortgage required the Mandys to maintain hazard

4

insurance on the mortgaged property, and the Mandys initially provided proof of hazard insurance to First Franklin.  The note required the Mandys to make a principal and interest payment of $924.80 on the first day of each month, beginning March 1, 1999.  Instead of establishing an escrow account for hazard insurance and property taxes, the Mandys elected to pay those fees directly.  The Mandys understood that if they did not pay their required taxes and maintain hazard insurance, the mortgage lender would advance those monies and seek reimbursement from them for those expenses.

On April 5, 1999, Defendant NationsCredit acquired the servicing rights for the Mandy mortgage.  On February 22, 2000, First Franklin assigned the ownership interest of the Mandy mortgage to NationsCredit.  During the period that  NationsCredit owned or serviced the Mandy mortgage, its records indicate that the Mandys were in default under the loan at various times and that the loan had accrued $657.94 in late charges.  NationsCredit's records also reflect that in 1999, 2000, and 2001, the Mandys failed to provide to NationsCredit  proof of hazard insurance on the property at issue, as the mortgage required.  Although NationsCredit has provided as evidence at least one properly-addressed letter requesting that the Mandys provide proof of hazard insurance, the Mandys deny receiving this request or any other notice from NationsCredit that proof of hazard insurance was needed.  In any event, in 1999, 2000, and 2001, NationsCredit purchased hazard insurance on the property at issue pursuant to mortgage provisions, and it advanced $3,150.66 to the Mandys' loan for those purchases during its ownership of the Mandy mortgage.  Although the Mandys claim that they actually maintained hazard insurance on their property during the life of the mortgage loan, the record reflects that their property was covered from 3/08/00 to 3/08/01; 3/08/01 to 3/19/01; from 11/29/01 to 8/26/02; from 9/09/02 to

5

11/26/02; from 12/10/02 to 2/26/03, leaving substantial uninsured periods.  Any claims against SPS from this period were extinguished by the *Curry* class settlement.

On December 6, 2001, NationsCredit executed a Purchase and Sale Agreement to sell to SPS effective January 2002 the loan servicing rights on a number of mortgages, including the Mandy mortgage.  Through this agreement, SPS agreed to "purchase, accept, acquire and assume from [NationsCredit], all of the Purchased Assets and the Assumed Liabilities. . . ."  The agreement defines the term "Assumed Liabilities" to include "the liabilities and obligations with respect to the servicing of the Mortgage Loans, as specified in [the] Agreement, the Servicing Agreement, and the Subservicing Agreement arising from and after the Closing Date. . . ."  Pursuant to the servicing agreement between NationsCredit and SPS, SPS had "full authority acting alone to do any and all things in connection with providing services for the Retained Mortgage Loans," including the Mandys' loan.   During the period of SPS's servicing of the Mandys' loan, NationsCredit was not engaged in extending new loans.  Through April 2002, a transition period occurred during which SPS utlized NationsCredit's systems to service borrower loans, pending its capture and storing into its own data processing systems information concerning borrower loans. As previously noted, when NationsCredit transferred the loan service to SPS, NationsCredit's records indicated that the company had advanced $3,150.66 to the Mandy's account for the purchase of lender-placed hazard insurance and that the loan had accrued $657.94 in late charges.  In a letter dated March 11, 2002, NationsCredit notified the Mandys of its assignment to SPS of all servicing duties.

A few months after SPS began servicing the Mandy's mortgage loan, SPS, through its insurance vendor, mailed to the Mandys a "Certificate of Coverage Placement."  The

letter/certificate explained that because the Mandys had not responded to prior correspondence requesting proof of hazard insurance coverage, SPS would purchase a policy through Balboa Insurance Company or Meritplan Insurance Company on their behalf with coverage in the amount of $105,509 and would charge the premium to the Mandys' escrow account monthly. The letter/certificate invited the Mandys to supply SPS with evidence that they already had acceptable insurance on the property. Between September 23, 2002 and December 16, 2003, SPS advanced $2,106.00 for the purchase of hazard insurance through Balboa Insurance Company, because the Mandys still had not provided proof of coverage.

The Mandys acknowledge receiving notification from SPS that they needed to provide proof of insurance. They claim that they contacted SPS and informed the company that they had hazard insurance, but the company asked them to provide proof of the insurance to Balboa Insurance. The Mandys attempted to contact Balboa by calling the number that SPS provided, but could not "get through" their phone system and never spoke to a representative at Balboa. They admit they never provided proof of insurance to either Balboa or SPS.

In April of 2003, SPS learned from its tax vendor that the Mandys had not paid their property taxes for several years, that a third-party had paid the taxes, and that the third party had placed a tax lien against the Mandy's property. Because of the Mandy's failure to pay property taxes, SPS was required to advance $7,919.05 to the Shelby County Tax Collector to protect its interest in the property.

Although the parties dispute the exact number of payments that the Mandys made on the mortgage note, they made at least sixty-one payments. The Mandys insist that they tendered payments on the loan in the amount of $71,057.58, with more than $9,000.00 submitted in excess

of principal and interest.  Of the Mandy's $71,057.58 figure, $1,000.00 represents an amount tendered to SPS after the institution of foreclosure proceedings.  SPS returned the check because it was less than the amount necessary to reinstate the loan.  However, the Defendants' records show that the Mandys remitted $68,207.98 from loan inception to foreclosure, with $12,806.09 submitted in excess of principal and interest for insurance, taxes, and late fees.   To support their calculations, the Mandys do not provide documentation, such as cancelled checks, wire transfer documentation, or any evidence except Donald Mandy's sworn affidavit.  While Donald Mandy's affidavit purports to base his calculations on payment records that he has retained, he did not attach those records to his affidavit or otherwise offer them as evidence in opposition to the motion for summary judgment.   In any event, the amount the Mandys submitted in excess of principal and interest – by either calculation –  is less than the amount SPS claims that it paid on behalf of the Mandys for property taxes and hazard insurance: $15,700.00.

The history of the foreclosure process on the Mandys' mortgage loan is complicated.  The first time SPS referred their account to Scott J. Humphrey, a licensed Alabama lawyer, for foreclosure was September 5, 2002.   At this time, SPS records showed that the Mandys were two months behind on their mortgage payments and had a negative escrow[1] balance of approximately $3,200.18 because of corporate advances for hazard insurance and taxes.  The Mandys' evidence is internally inconsistent; their brief's "additional undisputed facts" state that as of September 5, 2002, the total payments tendered equaled $52,807.77 and the total principal and interest due as of that date equaled $51,696.87.  However, Donald Mandy's affidavit states

---

[1] Although the Mandys initially chose not to establish an escrow account for taxes and insurance, but to pay those fees directly, NationsCredit  – and later, SPS – established an escrow account on their account when the company paid taxes and purchased insurance on the Mandys' behalf, so that it could charge those fees to them.

that the total payments tendered as of that date equaled $42,807.77, and that the amount of principal and interest due as of that date equaled $40,587.63.  In any event, SPS referred the Mandys' account to foreclosure and advanced Humphrey $900.00: $500.00 in advance for legal fees and $400.00 in advance for costs. SPS charged Humphrey's bill to the Mandys' account. SPS learned as a result of discovery in the instant law suit that Humphrey inflated the amount of costs incurred.  The Mandys made payments and the foreclosure did not proceed in the fall of 2002.  (The class settlement extinguished any claims against SPS for this period.)

The Mandys defaulted on their mortgage payments again in February of 2003 and SPS again engaged Humphrey to initiate foreclosure proceedings.  Humphrey again invoiced SPS for attorney's fees and expenses in the amount of $1,536.55, and SPS charged this amount to the Mandys' account.  SPS learned through discovery in the instant suit that Humphrey's bill included expenses that Humphrey did not incur.  The Mandys  ultimately requested and received a forbearance agreement to reinstate the mortgage.  This forbearance agreement called for an initial payment of $2,000 and monthly payments of $2,000 per month, beginning June 30, 2003. They made monthly payments under the forbearance agreement on April 30, 2003; June 30,2003; July 30, 2003; and August 30, 2003.

SPS referred the Mandy loan for foreclosure for a third time in October 2003.  In September of 2003, SPS contacted the Mandys about the "missed" their May payment.  The Mandys responded that the forbearance agreement did not called for a May payment.  SPS eventually learned that the Mandys were correct in their assertion that they had not "missed" their May payment.  A dispute exists regarding whether the Mandys submitted their September payment under the forbearance agreement.  When SPS would not agree with their position that

9

they had made all required payments, the Mandys requested a second forbearance plan.  In connection with this request, SPS asked the Mandys to provide proof of their income.  They represented on their application for a repayment plan that they had an income of $5,000.00 per month.  However, because they could not provide proof of that income as SPS requested, SPS declined their request for a second forbearance plan.  The Mandys' tax records reflect that they overstated their income on their application; they earned an *annual* income of $5378.00 in 2003, and that their average *annual* income between 1999 and 2003 was $11,587.80[2].

A "Foreclosure Delay/Sale Postponement Form" dated November 5, 2003, indicates that the total reinstatement amount for the Mandys' account equaled $11,435.16.  SPS provided the Mandys with a reinstatement amount on November 12, 2003 and informed the Mandys that the amount required to reinstate the loan equaled $14,000.  On November 13, 2003, one day prior to the scheduled foreclosure, Donald Mandy tendered a $14,000.00 payment to stop the foreclosure proceedings. SPS accepted this payment and did not foreclose on the house at this point.  As noted previously, Plaintiffs assert no claims against SPS accruing in 2003.  Entries in SPS's "Contact History" records reflect that SPS held amounts in suspense as late as February 2004.  In 2004, SPS applied this payment to bring their principal and interest payments current and applied the remaining funds to reduce corporate advances.

As a result of the third foreclosure proceedings, Humphrey invoiced SPS for attorney fees and expenses in the total amount of $1,496.10, including $996.10 in expenses.  SPS charged this

---

[2]These figures come from tax returns that this court twice ordered Plaintiffs to produce as part of discovery in this case.  The court learned that Plaintiffs had not previously filed tax returns for the years 1999-2003, and that the delay in providing these returns occurred because Plaintiffs were preparing these returns for the first time in response to this court's Orders.

bill to the Mandy's account.  Through discovery in the instant case, SPS discovered that

Humphrey charged SPS for expenses that he did not incur.

Plaintiffs remitted monthly payments for December 2003, January 2004, February 2004,

and March 2004.  In April, May, and June of 2004, the Mandys made no further payments but

had several conversations with SPS regarding the status of their account and claim that they

requested a reinstatement quote.

On July 9, 2004, SPS engaged Humphrey for a fourth time to foreclose on Plaintiffs'

mortgage loan.  One of the documents that SPS sent to Humphrey on this date included the

words "23 days to projected legal date" but no testimony of record explains this phrase.  On July

11, 2004, Plaintiffs submitted a loan payment of $1,000.00 to SPS, but SPS returned this

payment, because it was less than the total amount necessary to reinstate their loan.   On or about

July 12, 2004, the Mandys spoke to an SPS representative, requested a reinstatement quote, and

inquired about the status of their account.  According to the Plaintiffs, the SPS representative

advised them that no foreclosure would occur until September 22, 2004.  SPS records reflect that

on July 13, 2004, it generated a properly-addressed letter to the Mandys setting forth the amount

required for reinstatement.  However, the Mandys deny receiving this letter.  Humphrey's records

include a letter to the Mandys, properly-addressed, and dated July 9, 2004 but stamped "mailed"

with handwritten date notation of "7/14/04" on his file copy of the letter.  The letter advised them

of the foreclosure proceedings and attached a notice to run in the Shelby County Reporter setting

the foreclosure date as August 12, 2004.  The Mandys claim not to have received this letter.  On

August 4, 2004, SPS provided Attorney Humphrey with a bid instruction worksheet, directing

him to bid the full loan payoff amount of $117,078.66, plus any unpaid legal fees and costs that

Humphrey incurred in the foreclosure process.

Humphrey scheduled the Mandys' foreclosure for August 12, 2004.  On the morning the foreclosure was scheduled, Kathy Mandy answered a knock on the house door and spoke to a man who inquired about the house and advised her that the house was being sold in foreclosure that day; the Mandys claim that they did not know of the foreclosure date before this communication.  Kathy Mandy then contacted her husband who called SPS in an attempt to tender funds and halt the sale.  However, SPS did not accept funds or halt the sale, and the foreclosure proceeded on August 12, 2004.  Without the knowledge of SPS, Humphrey disregarded the bid instruction and directed his auctioneer to bid $126,181.66.  A third party purchased Plaintiffs' home at the foreclosure auction for $126,181.66.

On August 13, 2004, Humphrey deposited the sales proceeds of $126,181.66 into his law firm's trust account.  He then wrote a letter to SPS, enclosing a check to SPS in the amount of $118,913.16 drawn on his trust account.  In the letter, he incorrectly advised SPS that the check represented "the amount that was realized at the foreclosure sale, wherein the subject property was sold to a third party purchaser for $1.00 over the specified bid amount of $117,078.66, plus $1,833.50 for my firm's legal fees and costs."  Humphrey then wrote a check drawn on his firm's trust account in the amount of $7,268.50 made payable to "Scott J. Humphrey, LLC," representing the difference between the amount actually realized at the foreclosure sale and the amount forwarded to SPS.  Humphrey admits that he did not advise SPS of the $7,268.50 surplus he retained after the foreclosure sale, because he knew that SPS would not have allowed him to retain that amount.  He further admits that he did not pay SPS any portion of those surplus funds he retained.  Finally, he admits that he submitted invoices to SPS on at least four occasions

12

during the years 2002 through 2004 that inflated the amount of expenses he incurred in connection with the Mandys' foreclosure and that SPS was not aware that the expenses he listed were incorrect.

SPS's computer records indicate that the final bid on the Mandy's property was $122,574.00 – not $118,913.16 –  an amount larger than Humphreys' check to SPS following the foreclosure.  SPS explains this discrepancy as a computer inputting error on the part of a foreclosure representative.  SPS's evidence shows that the only money it received from the Mandy foreclosure was Humphrey's check in the amount of $118,913.16 with the accompanying letter setting the final bid amount at $118,913.16.  SPS admits that it charged Humphreys' inflated expenses to the Mandys' loan, not knowing that those expenses were inflated.  The only money that SPS acknowledges that it received as a result of Humphreys wrongful actions is the interest it charged on the portion of the expense amounts that Humphrey inflated.  SPS  notes, however, that the interest charged the Mandys on the inflated portion of expenses was less than the $657.59 in late charges on the Mandys account that SPS waived  following liquidation of the Mandys' loan.

After the foreclosure sale took place, the Mandys retained counsel and redeemed the property from the third party for $126,712.09, the amount the foreclosure deed reflected plus the expenses the purchaser incurred.  The redemption occurred before the Mandys were required to vacate their home.  After the Mandys redeemed their property, they made inquiries to Humphrey and SPS about the excess proceeds collected from the sale.  SPS responded by directing the Mandys to contact Humphrey.  Humphrey did not provide additional information until December of 2005, at which time Humphrey sent a check to the Mandys in the amount of $5,129.40 and

informed them that this amount represented all of the excess funds collected in the sale.

On August 11, 2006, the Mandys filed the instant lawsuit in Shelby County Circuit Court against SPS and NationsCredit.  The Complaint contains six counts: Count One - Breach of Contract; Count Two - Fraud and Suppression; Count Three - Negligent Hiring, Training, and Supervision; Count Four Wrongful Foreclosure; Count Five - Money Had and Received; and Count Six - Breach of Fiduciary Duty.  Defendants removed it on September 15, 2006 pursuant to 28 U.S. C. § 1332.  On January 5, 2007, SPS filed a Motion for Judgment on the Pleadings, or, in the Alternative, Motion for Summary Judgment (doc. 13).  The Plaintiffs filed a Motion to Continue Summary Judgment pursuant to Rule 56(f) (doc. 17).  This court granted the motion to continue and denied SPS's motion for summary judgment in light of outstanding discovery but specified that the denial was "without prejudice to refile upon completion of Plaintiffs' requested discovery." (doc. 21).

Also in January 2007, SPS requested that Humphrey provide it with a copy of the foreclosure file that he maintained on the Mandys, and Humphrey did so.  SPS waived the attorney-client privilege with respect to the foreclosure file and provided a copy of it to the Mandys' counsel in February of 2007.  Sometime after receiving Humphrey's foreclosure file, SPS claims that it learned for the first time of Humphrey's wrongful conduct.  After completing an internal investigation of the matter, SPS formally terminated its relationship with Humphrey and his law firm in April 2007.  On May 2, 2007, SPS wrote a letter to the Mandys in care of their counsel, advising them that SPS had audited Humphrey's foreclosure file on the Mandys and discovered that Humphrey had wrongfully and secretly retained surplus proceeds.  SPS enclosed a refund check to the Mandys in the amount of $4,011.61, representing all excess funds

and inflated expenses that Humphrey had taken, and advised them that SPS would seek reimbursement directly from Humphrey.

At the close of discovery, both SPS and NationsCredit filed the instant motions for summary judgment.

In various motions dated September 14, 2007; February 14, 2008; and May 12, 2008; and September 5, 2008, Defendants requested orders from the court requiring Plaintiffs to produce tax records requested in discovery or sanctioning them for failing to do so.  In an Order  dated October 17, 2007, the court required Plaintiffs to produce tax returns.  Plaintiffs produced copies of tax returns for 1999-2004 but would not confirm that they had been filed.  When they had failed to produce copies of *filed* tax returns by February 21, 2008, the court entered an Order of that date requiring them to confirm that the tax documents they produced had been filed and requiring them to produce 1998 tax returns.  Approximately two weeks after that Order, Plaintiffs advised SPS's counsel that the 1999-2004 returns had not actually been filed with the IRS.  In March of 2008, Plaintiffs filed the 1999-2004 tax returns, but did not produce written evidence of this filing and did not produce tax returns for 1998, 2005, or 2006.

On May 12, 2008, Defendants filed motions to dismiss on the grounds that Plaintiffs had not yet provided them with filed tax returns.  After the court entered a an order to show cause why the case should not be dismissed, Plaintiffs produced copies of the 2005 and 2006 returns, but did not produce 1998 tax returns, stating that they could not remember if they filed 1998 returns.  Plaintiffs advised the court at the hearing in the fall of 2007 and in response to the motion to dismiss that the reason for the delay in producing the 1999-2004 tax returns was that they did not exist; Plaintiffs had not filed tax returns for those year and they had to be prepared

for the first time.  On July 1, 2008, the court denied Defendants' motion to dismiss, but imposed

costs upon Plaintiffs as a sanction for failing to produce their 1998 tax returns as ordered.

   In September of 2008, SPS and Nationscredit  filed separate motions for an order that

certain facts be taken as established under Rule 37 based on Plaintiffs' continued failure to

produce 1998 tax returns.   Defendants subsequently filed supplemental briefs in support of

summary judgment, referencing the Rule 37 motions.   This court held a pretrial on September

16, 2008, and announced at the pretrial its intention to grant the motions for an order that certain

facts be taken as established and to grant Defendants' motions for summary judgment, because

the doctrine of *in pari delicto* bars the Mandys from pursuing their claims.

   Subsequent to the pretrial but before the court entered the rulings it referred to at the

pretrial, the Mandys filed a motion to vacate, which this court denied.  In addition, the Mandys

filed "Plaintiffs' Objection and Motion to Strike Defendants' Respective 'Motion[s] for Order

that Certain Facts Be Taken as Established' [ct. doc. 108 and 110] and 'Brief[s] in Support of

Summary Judgment' [ct. doc. 111] and Plaintiffs' Motion, in the Alternative, Requesting an

Order Scheduling the Submission of Dispositive Motion Briefs in Conformity with the 'ALND

Uniform Initial order Governing All Further Proceedings' [ct. doc. 5]."  This court denied the

motion to strike, but granted the alternative motion, allowing Plaintiffs until September 26, 2008

to respond to the Rule 37 motions and supplemental brief.  Plaintiffs did not respond on

September 26, 2008.  However, they did file a response brief at 12:12 a.m. on September 27,

2008.  At 5:05 p.m. on September 27, 2008, Plaintiffs filed an affidavit of Donald Mandy, raising

new facts regarding the mortgage and loan application.

   On September 30, 2008, Defendant SPS filed a motion to strike Donald Mandy's

affidavit filed September 27, 2008, and the court granted that motion, because the affidavit was untimely.

### III.  DISCUSSION

#### A.  Motions for an Order That Certain Facts be Taken as Established

On September 5, 2008, Defendants SPS and NationsCredit filed separate motions, requesting this court to enter an Order taking as established the fact that the Mandys misrepresented their annual income and financial condition to obtain the mortgage loan made the basis of the lawsuit.  As support for those motions, the Defendants relied on the following: the Order of this court dated February 21, 2008, directing the Mandys to produce a copy of their 1998 income tax return;  the Order of this court dated July 1, 2008, noting the Mandys' failure to comply with its February Order and sanctioning the Mandys for that failure; previous discovery Orders of this court;  and Rule 37 of the Federal Rules of Civil Procedure.  The Mandys had not filed any response to these motions as of the date of the pretrial conference.  On September 19, 2008, after the pretrial conference where the court announced its intended ruling on these motions, Plaintiffs filed an objection and motion to strike Defendants' Rule 37 motions[3] and supplemental briefs in support of summary judgment, and alternatively, a motion requesting an opportunity to respond to those motions and supplemental briefing to the pending motions for summary judgment.  The court denied the motions to strike but allowed Plaintiffs an opportunity to respond.  The instant ruling comes after Plaintiffs' response.

Rule 37 of the Federal Rules of Civil Procedure confers upon the court broad discretion

---

[3] On September 19, 2008, Plaintiffs also filed a motion to vacate the court's order of September 16, 2008, the date of the pretrial conference.  Because the court had not entered an order on September 16, 2008, but had simply announced its intended ruling, the court denied that motion.

to control discovery. *United States v. Certain Real Prop. Located at Route 1*, 126 F.3d 1314, 1317 (11th Cir. 1997). Rule 37 provides the court authority to impose sanctions upon parties who flout its discovery orders, including the sanction to enter an order "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b)(2)(A)(i).

In the instant case, the requested Rule 37 sanction is tied to the discovery Order that the Mandys have ignored for six months. In response to SPS's motion to require compliance, the court ordered the Mandys on February 21, 2008 to produce a copy of their 1998 income tax returns. When the Mandys did not comply with that Order, the Defendants filed a motion to dismiss pursuant to Rule 37. Although the court denied the motion, it acknowledged the Mandys' failure to comply with its Order and imposed costs upon the Mandys. Further, the court noted that the Mandys had established a disturbing pattern in this case of flouting deadlines and court Orders and complying only after having been caught and called to task. Several of those previous Orders concerned the Mandys' failure to produce income tax returns for the years 1999 through 2006.

The tax returns already received and the unproduced 1998 tax returns are not tangential matters, but are squarely at issue in this case. The Mandys obtained the mortgage loan made this basis of this suit based in part upon their representation that they had an income of $4,000 per month and $48,000 per year. If they made their monthly mortgage payment of $924.80 in a timely manner, their yearly payments would be $11,097.60. Yet, the record reflects that the Mandys had a history of difficulty in paying not only on the mortgage loan payments in question but also property taxes. The record also demonstrates lapses in hazard insurance coverage on the

18

Mandys' property.  Because of these payment problems, the Defendants referred the Mandys' account to an attorney to institute foreclosure proceedings three times *before* the August 2004 foreclosure made the basis of this suit.  These repeated payment difficulties raise legitimate questions regarding the Mandys' income and financial status, including the question whether the Mandys fraudulently misrepresented their income to obtain the mortgage loan in question.

To obtain the Mandys' tax records and address the income issue, the Defendants made discovery requests and when Plaintiffs did not provide the filed tax returns, they were forced to file motions to compel.  Yet even when the court ordered the Mandys to produce tax records in response to such motions, more delays ensued.  The court notes that the primary reason for the Mandys' failure to produce these records was that they had not yet filed tax returns for many of the years requested, even though federal law requires them to do so.  When the Mandys did produce some of the tax returns requested, the information reflected on them demonstrated that the Mandys had an average income between 1999 and 2003 of $11,587.80 –  significantly less than the annual income of $48,000 represented on Donald Mandy's 1999 mortgage application and barely more than the annual mortgage payment.  In 1999, the year that the Mandys applied for the mortgage in question, their annual income was $9,022.00, less than a quarter of the income they listed on their application.  Also significant were the 2002 and 2003 tax returns, listing the Mandys' annual income as $9,112.00 and $5,378.00, respectively.  In light of the Mandys' statement on their 2003 application to SPS for a *second* forbearance agreement that their income was $5,000 *per month*, these returns are tantamount to an admission that the

19

Mandys lied about their income in 2003. [4] Although the Mandys' income apparently increased significantly in 2004, that increase occurred after five lean years with an income in no respect approximating the amount listed on these two applications.  In short, the Mandys' 1998 income – the year immediately before they applied for the mortgage and loan –  is undoubtedly at issue, and although the court ordered the Mandys to produce their 1998 tax records, they have steadfastly refused to do so.  At the recent pretrial conference, the court asked Plaintiffs' counsel whether the 1998 tax records were still outstanding, and counsel replied that the Plaintiffs were unsure whether they had filed 1998 tax returns and had no plans to produce them.

Over six months ago, the court ordered the Mandys to produce their 1998 tax records. Over two months ago, the court entered an order imposing sanction on them for failing to product those records and over a month ago, the court set the dollar amount of those sanctions.  Despite those Orders and reminders to act, the Mandys have still failed to produce their 1998 tax returns and further, have advised the court that they have no plans to do so.  The Mandys' flagrant disobeying of this court's Order is troubling in and of itself.  However, when that disobedience is added to the evidence on the record such as the annual incomes reflected on the 1999-2003 tax returns  and the misrepresentation of their income on SPS documents in 2003, the combination supports a finding that the reason for the Mandys' failure to comply is that the tax returns would conclusively establish their fraud in the mortgage application process.  Because the Mandys have repeatedly failed to comply with its discovery Orders, the court will GRANT Defendants' motions and will IMPOSE  the sanction under Rule 37 of taking the following fact as

---

[4] Because the Mandys provided no proof of their income, SPS did not accept the application for a second forbearance plan in late 2003.

established: that Donald Mandy misrepresented the Mandys' annual income and financial condition on the 1999 application to obtain the mortgage loan made the basis of this suit.  Such finding arises also from the financial information from 1999-2003, and the Plaintiffs' misrepresentation of their income in 2003.

## B.  Defendants' Motions for Summary Judgment

Defendants have moved that this court grant summary judgment in their favor and as grounds for their motions, they assert that the doctrine of *in pari delicto* bars the Mandys' recovery as a matter of law; and that no genuine issues of material fact exist and summary judgment is due on all claims as a matter of law.  First, the court will address the application of the *in pari delicto* doctrine.

The doctrine of *in pari delicto* "bars recovery by a plaintiff who is equally as guilty as the defendant in the breach of the law." *Ex parte W.D.J.*, 785 So. 2d 390, 393 (Ala. 2000).  This doctrine was enunciated in *Hinkle v. Railway Express Agency*, 242 Ala. 374, 6 So. 2d 417 (1942), and sometimes iscalled the "Hinkle Rule." It provides that "[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party."  6 So. 2d at 421.  The Alabama Supreme Court explained "that the purpose of the *Hinkle* rule is to ensure that 'those who transgress the moral or criminal code shall not receive aid from the judicial branch of the government.'" *Ex parte W.D.J.*, 785 So. 2d at 393 (quoting *Oden v. Pepsi Cola Bottling Co.*, 621 So. 2d 953, 955 (Ala. 1993)).  Accordingly, when the court finds that both parties have engaged in wrongful conduct, the court may invoke this doctrine and refuse to interfere in the dispute, leaving the parties where

it finds them.  *See Robinson v. Boohaker, Schillaci & Co.*, 767 So. 2d 1092, 1095 (Ala. 2000).

Courts have applied the doctrine of *in pari delicto* to a wide variety of claims sounding in tort

and contract.  *See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d

340, 354-355 (3d Cir. 2001) (finding that an analysis of *in pari delicto* "under the various causes

of action will typically be the same").

 Donald Mandy represented in his February 8, 1999 application for the mortgage loan

forming the basis of this dispute that his family's income was $4000 per month/$48,000 per year.

Mr Mandy signed the application immediately below the following certification:

> I/We certify that the information provided in this application is true and
> correct as of the date set forth opposite my/our signature(s) on this
> application and acknowledge my/our understanding that any intentional or
> negligent misrepresentation(s) of the information contained in this
> application may result in civil liability and/or criminal penalties including,
> but not limited to, fine or imprisonment or both under the provisions of
> Title 18, United States Code, Section 1001, et. seq. and liability for
> monetary damages to the Lender, its agents, successors or assigns, insurers
> and any other person who may suffer any loss due to reliance upon any
> misrepresentation which I/we have made on this application.

(doc. 109, Ex. A).   Further, he initialed the page of the application stating that his family

monthly income was $4,000.

 As noted above, the court has taken as established the fact that Donald Mandy's statement

of his family's income was fraudulent.  This fraud is significant; *but for* the fraud in the mortgage

loan application, no mortgage and related loan would exist.  Yet, despite Donald Mandy's fraud

in obtaining the mortgage loan, he and his wife have filed the instant suit, requesting that the

judicial system aid them in recovering for various claims arising out of that mortgage loan.

Defendants assert that Donald Mandy's fraud in obtaining the mortgage loan should bar their

recovery.

Plaintiffs argue, however, that the doctrine of *in pari delicto* – which means "in equal fault" – does not apply to the instant case; they assert that when the court weighs their alleged misconduct against that of Defendants, Defendants are *more* culpable.   The court acknowledges the Mandys' claims that Defendants have committed wrongful acts in connection with that mortgage loan and the foreclosure that ensued.   *The court does not find that Defendants are guilty of any of the wrongful acts that the Mandys assert against them*.   However, the court has carefully considered the claims against Defendants at the summary judgment stage, and would have granted the motion for summary judgment on all counts, except perhaps the breach of contract count.   Although Plaintiffs have made some serious claims against Defendants of tortious conduct, including fraud, "a mere 'scintilla' of evidence supporting [Plaintiffs'] position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."   *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).   Noting that Plaintiffs' evidence supports Defendants' culpability for *at most* breach of contract, the court balances that culpability against Plaintiffs' fraud.   Contrary to Plaintiffs' arguments, the weight of Plaintiffs' culpability is heavier than the alleged culpability of Defendants.   Defendants' alleged infractions after the issuance of the mortgage do not outweigh Plaintiffs' fraud in obtaining the mortgage. Accordingly, the court finds that the doctrine of *in pari delicto* bars the Mandys from pursuing those claims and recovering from the Defendants.   The court will GRANT both Defendants' motions for summary judgment as to all six counts of the Mandys' Complaint.

Although Defendants raise other grounds for summary judgment, the court need not address them, because of its holding based on the doctrine of *in pari delicto*.   Suffice it to say that

23

but for the *in pari delicto* decision, the court would have granted the motion for summary judgment on all counts, except perhaps the breach of contract count, because – based on the record at the time summary judgment came under submission[5] – no genuine issues of material fact exist and Defendants are entitled to judgment as a matter of law.  Plaintiffs have attempted to raise issues of fact by submitting evidence after the scheduled pretrial in this case and after the court advised them at the pretrial of its intended rulings,  granting summary judgment against them.  Absent good cause for varying from the submission order, this court should and will hold the parties to the submission order.

As to the breach of contract count, the court need not decide whether Plaintiffs' contention that they did not receive written notice of the impending foreclosure creates a genuine issue of material fact when the mortgage loan contract provided that  "notice shall be deemed to have been given" when mailed by first class mail and when Humphrey's records reflect that a foreclosure notice was mailed to Plaintiffs.  Having misrepresented their income to obtain the mortgage, Plaintiffs are barred from recovering from the Defendants for breach of contract.

## IV.  CONCLUSION

In summary, the court will GRANT Defendants' motions for an Order that certain facts be taken as established and will IMPOSE  the sanction under Rule 37 of taking the following fact as established: that Donald Mandy misrepresented the Mandys' annual income and financial condition on the 1999 application for the mortgage loan in question to obtain that loan. Further, the court will GRANT both Defendants' motions for summary judgment based on the doctrine of

---

[5]  The court notes that the issues Plaintiffs raised for the first time in the affidavit were not alleged in the Complaint or part of the summary judgment record based on timely evidentiary submissions in accordance with the submission orders.

*in pari delicto* and will DISMISS Plaintiffs' entire case.

Dated this 30th day of September, 2008.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE